**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**[GREENBELT DIVISION]**

| | |
|---|---|
| **ESTATE OF KEVIN CHARLES YATES, SR.**<br>235 Crane Swamp Road<br>Church Hill, Maryland 21623<br>*(By Laura Marie Burge-Yates,*<br>*Personal Rep. and Successor-in- Interest to*<br>*Decedent in the Survival Action),* | |
| **LAURA MARIE BURGE-YATES,**<br>235 Crane Swamp Road<br>Church Hill, Maryland 21623<br>*(Individually, as Wife of Decedent)* | **Case No. 1:19-cv-01012** |
| **KEVIN CHARLES YATES, JR.**<br>235 Crane Swamp Road<br>Church Hill, Maryland 21623<br>*(Individually, as Decedent's Sole Issue)* | |
| **&** | |
| **LISA STARR YATES**<br>308 Holly Road<br>Edgewater, Maryland 21037<br>*(Individually, as Mother of Decedent, a*<br>*Rule 19 Joinder Party)* | |
| **CHARLES LEWIS YATES. JR.**<br>308 Holly Road<br>Edgewater, Maryland 21037<br>*(Individually, as Father of Decedent, a*<br>*Rule 19 Joinder Party)*<br>*Both Represented by Attorney Mark*<br>*W. Howes (Bar I.D. 09489)*<br>     *Plaintiffs,* | |
| *vs.* | |
| **JOHN PATRICK GUIDOTTI**<br>64 Old South River Road<br>Edgewater, MD 21037<br>     *Defendant.* | |

1

_____

DAN R. MASTROMARCO
Bar ID: 18243
and STEPHEN KLING
Attorneys for Plaintiffs Laura Marie Burge-Yates
(in her Individual and Personal Representative Capacity
and Successor-in- Interest to Decedent in the Survival Action)
and Kevin Charles Yates, Jr.
THE MASTROMARCO FIRM, LLP
703 Giddings Avenue
Annapolis, MD 21401
T: 410.349.1725
F:  410.268.1597
Email:  danmastromarco@gmail.com
_____/

## COMPLAINT

**NOW COME** the above-entitled Plaintiffs, in their representative and individual capacities in order to bring this maritime Wrongful Death and Survival Action against Defendant John Patrick Guidotti (hereafter "Mr. Guidotti").  For their causes of action, the Plaintiffs state as follows.

## I.   COMMON ALLEGATIONS

### A.   SUMMARY OF ACTION

1.      On or about June 27, 2018, Kevin Charles Yates, Sr. (hereafter "Decedent") drowned in the navigable waterways of the Chesapeake Bay between Kent Island and Herring Bay near Deale, MD, during a crossing on Mr. Guidotti' Vessel.

2.      Decedent's death was due solely to the negligent actions and omissions of Mr. Guidotti before, during and after the crossing.

3.      Mr. Guidotti, *inter alia*, failed to heed weather forecasts, failed to properly prepare for the voyage, failed to properly equip his vessel for the voyage and circumstances, failed to be cognizant of the whereabouts of his shipmate, failed to deploy safety measures, failed to deploy

visual distress signals, failed to respond to Decedent's pleas for help, failed to render assistance to Decedent, and failed to timely call authorities when he knew or should have known Decedent was missing, abandoning Decedent to his inevitable fate.

**B.     THE PARTIES**

4.      Ms. Laura Burge-Yates (hereafter "Ms. Burge-Yates") is the widow of Decedent, having lawfully married him on November 6, 2010.

5.       Ms. Burge-Yates resides at  235 Crane Swamp Road, Church Hill, Maryland 21623 in the County of Queen Anne.

6.      Ms. Burge-Yates is the Personal Representative and Successor in Interest of the Estate of Kevin Charles Yates, Sr., which has been open and pending in Queen Anne's County since July 23, 2018 (Estate No. 12426).

7.      Kevin Charles Yates, Jr. (hereafter "Mr. Yates, Jr.") is the sole offspring of Ms. Burge-Yates and Decedent.

8.      Mr. Kevin C. Yates, Jr., who was 18 years-of-age at the time of his father's death, temporarily resides in the District of Columbia where he attends American University.

9.      Plaintiffs Lisa Starr Yates (hereafter "Ms. Starr Yates") and Charles Lewis Yates Jr. (hereafter "Mr. Charles Lewis Yates") are the Mother and Father of Decedent, and both are residents of the State of Maryland.

10.     Mr. Guidotti is a resident of the State of Maryland, and is believed to reside in Anne Arundel County, Maryland on board the very vessel that is the subject of this action, a 40-foot twin propeller cabin-cruiser (hereafter the "Vessel").

11.      Upon information and belief, Mr. Guidotti currently moors his Vessel in Hawk Marina, which is located at 64 Old South River Road, Edgewater, MD 21037, having moved his Vessel

from Herrington Harbor South of 7145 Lake Shore Dr, in North Beach, MD 20714.

12.     Upon information and belief, Mr. Guidotti resides on board the Vessel.

## C.     JURISDICTION AND VENUE

13.     The subject matter jurisdiction of this Court is predicated on U.S. CONST. art. III, §2 which provides that the juridical power of the United States shall extend to all cases of maritime jurisdiction.

14.     The subject matter jurisdiction of this Court is also predicated on the Judiciary Act of 1789 (§9, 1 Stat76-77) as codified in 28 U.S.C. §1333.

15.     Title 28 U.S.C. §1333 provides that the federal "district courts shall have original jurisdiction, exclusive of the courts of the States, of "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

16.     The incident alleged in this lawsuit bears a substantial and significant relationship to traditional maritime activity.

17.     Mr. Guidotti's navigation across the Chesapeake Bay from the Eastern Bay to Herring Bay took place entirely within a navigable waterway of the United States.

18.     Decedent drowned within the navigable waterway of the United States in the middle of a major shipping channel.

19.     The search and rescue operations that followed Decedent's disappearance took place entirely over and within the navigable waterways of the United States, which was disruptive to, and created a potential hazard for, maritime commerce.

20.     The assiduous search efforts by the U.S. Coast Guard and the Maryland Department of Natural Resources Police invoked the actions of lifesaving stations, boats and sundry rescue resources, both personnel and equipment.

21.     This action gives rise to a wrongful death and survivor action recognized under both state law and federal maritime common law.

22.     The wrongful death action is authorized at the state level by Courts and Judicial Proceedings (hereafter "CJP") Title 3 (Courts of General Jurisdiction—Jurisdiction/Special Causes of Action), Subtitle 9 (Wrongful Death), and in particular §§3–902 and 3–904 thereof.

23.     Jurisdiction over the subject matter of the survival action is predicated at the state level on CJP §6-401 (concerning survival of actions) and Title 7 (Administration of the Estate) (hereafter "Est. & Trusts"), Subtitle 4 (Powers of Personal Representative), §7-401 (General Powers), particularly §7-401(y) thereof.

24.     Venue is proper in the Judiciary District of Maryland under 28 U.S. Code §1391 because all defendants are residents of the State in which the district is located, and all the events or omissions giving rise to the claim occurred in Maryland.

**D.     COMMON FACTUAL ALLEGATIONS**

25.     Mr. Guidotti purchased the subject Vessel from a company known as "Knot 10 Yacht Sales" only two days before the tragic event that gave rise to this action, on or before Monday, June 25th, 2018.

26.     Knot 10 Yacht Sales is located at 106 Wells Cove Road in Grasonville, MD in the County of Queen Anne.

27.     Mr. Guidotti paid cash for the Vessel in an unknown amount, but an amount believed to be at least $54,000.

28.     Sometime after either purchasing his Vessel or deciding to do so, Mr. Guidotti imposed upon Decedent to help him deliver the Vessel to Herrington Harbor South Marina, where Mr. Guidotti planned to moor the Vessel.

29.     Herington Harbor South Marina is a full-service marina facility located at 389 Deale Rd, Tracy's Landing, MD 20779 in the County of Anne Arundel.

30.     The crossing required Mr. Guidotti to pilot the Vessel from the Eastern Shore to the Western Shore of Maryland.

31.     While on Mr. Guidotti's Vessel, Mr. Yates served as passenger, an invitee or a guest to who sought to assist Mr. Guidotti in the crossing.

32.     On Wednesday, June 27, 2018, Mr. Guidotti did in fact captain the Vessel on a course that was to take the parties from Kent Island through the channel to Herring Bay, and thenceforth to the Herrington Harbor Marina.

33.     No other souls were on board the Vessel except Mr. Guidotti and Decedent.

34.     On that fateful day, the temperature averaged 76 degrees Fahrenheit.

35.     The winds averaged from between 7 to 18 knots, becoming more variable as the day advanced.

36.     Indeed, at 10:00 a.m., Annapolis Naval Academy station reported winds of 9 miles per hour, with no gusts.

37.     At 1:54 p.m. that same day, the Annapolis Naval Academy station reported no change in the wind condition.

38.      But at 2:54, the Annapolis Naval Academy station reported winds blowing at 16 miles per hour, gusting to 23.

39.     Upon information and belief, during this crossing, at some time at or near 1:30 p.m. in the shipping channel East of Poplar Island, near Buoy No. 84 and within the navigable waterways of the Chesapeake Bay, Decedent fell overboard.

40.     At the time Decedent fell overboard, Mr. Guidotti was at the helm steering his Vessel.

41.      Decedent was conscious and alert at the time he entered the water.

42.      In fact, while submerged, Decedent made several desperate attempts to communicate his peril to Mr. Guidotti.

43.      Decedent first shouted to Mr. Guidotti as he treaded water.

44.      And when his shouting proved ineffective, Decedent placed two successive cell phone calls to Mr. Guidotti as  he struggled to say afloat, each time leaving frantic voice mail messages pleading for Mr. Guidotti to render assistance.

45.      Decedent left his last voice mail at approximately 1:50 p.m.

46.      For some unknown reason, however, Mr. Guidotti neither answered Decedent's distress calls nor did he return any of Decedent's calls.

47.      Mr. Guidotti either saw the incoming call and chose to ignore it, heard Decedent's entreaties and callously chose to ignore them, or did not have his phone in a position or status where he could see or hear it.

48.      Each time Mr. Guidotti's phone rang, had the device been turned on, the incoming call from Decedent would have been identifiable to Mr. Guidotti.

49.      In any event, Mr. Guidotti negligently either failed to observe Decedent was no longer present on board his Vessel (despite that they had been the only two persons on board), or having noted Decedent's absence, failed to take appropriate action.

50.      Mr. Guidotti either allowed considerable time to transpire before he checked on the whereabouts of Decedent; or alternatively, knowing of Decedent's disappearance, simply kept going forward as if nothing had occurred.

51.      After Mr. Guidotti knew or should have known that Decedent had fallen overboard, he took no efforts to circle back, to stop, to slow his speed, to reverse course, or to mark the location

of Decedent's disappearance.

52.     Furthermore, after Mr. Guidotti either knew or should have known that Decedent went overboard, Mr. Guidotti took no action to throw or otherwise deploy a flotation device to aid Decedent.

53.     After Mr. Guidotti either knew or should have known that Decedent went overboard, Mr. Guidotti took no action to initiate any visual distress signal.

54.     Mr. Guidotti employed neither a hand-held flare, a parachute flare, a red meteor flare, an orange smoke signal nor an orange signal flag.

55.     Had Mr. Guidotti taken any of these actions when he knew or should have known that Decedent was overboard, Decedent may be alive today.

56.     Sometime around 2:30 p.m. as he continuing on his course without Decedent, Mr. Guidotti navigated his Vessel to the waters of Herring Bay.

57.     Mr. Guidotti, then navigated the narrow channel into the Herrington Harbor marina, docking and securing the Vessel without assistance.

58.     Upon information and belief, Mr. Guidotti was an accomplished sailor, having admittedly logged more than 1,000 hours on navigable waterways.

59.     Even then, when securely in dock, Mr. Guidotti took no action to notify first responders; for example, by calling the U.S. Coast Guard, the police or 911 emergency response services.

60.     In fact, Mr. Guidotti took no action whatsoever to alert anybody whatsoever to the fact Decedent was missing, until at least 1 hour after he knew or should have known Decedent was missing.

61.     When Mr. Guidotti did finally advise someone about Decedent's disappearance, he did so by calling an unknown third-party companion (hereafter "John Doe").

62.     Again, this was after Mr. Guidotti had navigated and singlehandedly docked the boat at the desired slip location.

63.     More specifically, sometime between 2:30 and 2:45 p.m., Mr. Guidotti imparted to John Doe that Decedent had fallen overboard.

64.     When informing John Doe about the disappearance of Decedent, Mr. Guidotti became emotional; providing John Doe with vague, imprecise, indecisive, indeterminate and unhelpful information about the location and timing of Decedent's disappearance.

65.     Mr. Guidotti advised John Doe only that Decedent went missing somewhere between Kent Island and Herring Bay, without a definitive reference to either time or location.

66.     Shortly thereafter, John Doe phoned the U.S. Coast Guard Sector Maryland-National Capitol Region to relay the information Mr. Guidotti had provided to him.

67.     The U.S. Coast Guard Maryland-National Capital Region first received this report at about 2:45 p.m.

68.     Upon information and belief, therefore, Decedent went missing, either long before Mr. Guidotti realized he had fallen overboard or long after Mr. Guidotti, while aware of his disappearance, bothered to speak to the authorities.

69.     Again, Mr. Guidotti did not initiate that call; instead, an unknown third party (hereafter "John Doe") initiated the call, after, upon information and belief, Mr. Guidotti advised Mr. Doe of Decedent's disappearance.

70.     Upon receiving the distress call from Mr. Doe, the first responders deployed their forces in a desperate attempt to locate Decedent.

71.     The US. Court Guard deployed its MH-65 Dolphin Helicopter from Air Station Atlantic City, New Jersey.

72.     The Maryland Natural Resources Police began their extensive search for Decedent, complete with helicopters.

73.     The Anne Arundel Fire Department deployed seagoing Vessels in their search for Decedent.

74.     But Mr. Guidotti was apparently unable to tell the National Resources Police when and where Mr. Guidotti had left the Vessel.

75.     And given this lack of locational and temporal specificity, the search and rescue teams were greatly handicapped in homing in on a possible location.

76.     All told, the various search and rescue teams completed 39 searches on land and air, covering more than 870 square nautical miles of the Chesapeake Bay's navigable waterways and shipping channels before suspending the search for Decedent on Friday, June 29th, 2018.

77.     Upon later investigation, law enforcement authorities reported that Mr. Guidotti's Vessel was strewn with alcohol.

78.     And according to the police report, Mr. Guidotti admitted to consuming alcohol before and during the crossing.

79.     On or about July 2, 2018, Decedent's body was discovered near Poplar Island.

80.     And autopsy of Decedent's body was then conducted.

81.     According to a July 5, 2018 report by Bruce Goldfarb, Spokesman for the Office of the Chief Medical Examiner for Maryland, Decedent died from drowning.

82.     Decedent was a non-drinker.

83.     And the autopsy recalled that Decedent was neither under the influence of alcohol or drugs at the time of his death.

## II.  THE CAUSES OF ACTION

**COUNT I: NEGLIGENCE**
**(Against Mr. Guidotti on Behalf of the Estate of Kevin Charles Yates, Sr. under the Survival Statute (as Authorized by CJP §6-401))**

84.     Plaintiff, the Estate of Kevin Charles Yates, Sr.**,** through Laura Marie Burge-Yates, its Personal Representative, incorporates by reference each and every prior and subsequent allegation as if fully set forth herein.

85.     Mr. Guidotti, as all owner of vessels in navigable waterways, owed to all who boarded his Vessel a duty to exercise reasonable care, regardless of whether his shipmate was a guest, an invitee, a crewmember, a licensee, a passenger or held some other status.

86.     Mr. Guidotti at all times relevant hereto therefore owed Decedent the duty to exercise reasonable care to protect Decedent from injury.

87.     Mr. Guidotti breached this duty of care to Decedent by his acts and omissions, literally at all phases of the fateful crossing: before the journey began, when piloting the Vessel and after he knew of should have known of Decedent's disappearance.

88.     Prior to the voyage,  Mr. Guidotti failed to have the Vessel surveyed and did not authorize or conduct a Vessel Safety Check.

89.     Mr. Guidotti failed to have the vessel surveyed even though such survey and inspection was a free service provided by the U.S. Coast Guard Auxiliary, a volunteer organization dedicated to assisting the Coast Guard in boating safety.

90.     Such free examination may have exposed any deficiencies in safety equipment of his Vessel, and almost assuredly resulted in recommendations to improve his Vessel's safety.

91.     Prior to the voyage, Mr. Guidotti acted carelessly when he failed to properly apprise himself of the marine weather forecast or, in the alternative, having been so apprised, ignored the warnings and advisories that were issued.

92.     Mr. Guidotti acted carelessly when he (a) failed to monitor evolving weather conditions during the course of his voyage, and (b) failed to take necessary precautions to ensure the safety of his shipmates if and when the weather changed.

93.     Had Mr. Guidotti monitored the weather forecast as a prudent captain would have done, the voyage would likely never have taken place.

94.     Before the voyage, Mr. Guidotti failed to assure there were no tripping hazards or loose holds that could cause Decedent or any crewmember to fall overboard, and barring resolution of any such issues, failed to alert his crewmember to known defects that did exist.

95.     Having commissioned no safety survey that would have revealed inadequacies, Mr. Guidotti was negligent in failing to have on board safety equipment that he was required by law to have on board.

96.     In the alternative, Mr. Guidotti was negligent in failing to familiarize himself with the location and operation of the safety devices he did have on board.

97.     For example, Mr. Guidotti was negligent by failing to maintain onboard U.S. Coast Guard approved Personal Floatation Devices (PFD), including one throwable PFD, or to properly deploy the floatable devices he did have onboard.

98.     Mr. Guidotti was negligent in failing to have on board U.S. Coast Guard approved Visual Distress Signal (such as a U.S. Coast Guard Approved orange distress flag, or an electric distress flag), or apparently any distress-signaling device for that matter.

99.     Mr. Guidotti was negligent by failing to have on board or have accessible U.S. Coast Guard Approved Pyrotechnic Visual Distress Signals, whether in the form of a red flare, a parachute flare, a hand-held flare, or a floating flare.

100.    If Mr. Guidotti had on board *any* form of Visual Distress or Pyrotechnic Visual Distress

Signal in the Vessel, he was negligent in failing to locate and properly deploy such device, which may have alerted responders to the emergency and assisted them by marking the time and location of the Decedent's disappearance.

101.     Mr. Guidotti was negligent in failing to have onboard a ship-to-shore communication or other device that would have enabled him to establish contact with emergency personnel.

102.     Mr. Guidotti's failure to have on board or within reach any communication device that could be clearly heard, felt of seen was a violation of MD Nat Res. §8-740.1.

103.     Had Mr. Guidotti had such a device on board, as simple as an operational cell phone, and had Mr. Guidotti been alert or disposed enough to deploy that device, he would have been able to contact rescue personnel when he heard Decedent's pleas for help or when he knew or should have known Decedent had gone missing.

104.     In short, Mr. Guidotti was negligent by failing to have a proper communication system on board his Vessel, or if he had such a device, by failing to ensure that it was in working order or that he possessed the modicum of skill required to use it.

105.     Mr. Guidotti was also negligent in other ways; for example, upon information and belief, by playing music at a volume that he knew or should have known would have created a dangerous situation by muffling any cries for help or audible cues of a man gone overboard.

106.     In fact, upon information and belief, Mr. Guidotti played music so loudly during the crossing that he violated Nat Res. §8-725.4's threshold requirements of 90dB(a).

107.     Had Mr. Guidotti not been careless in choosing to play music so loudly he would have heard Decedent's splash into the water or his subsequent shouts for assistance.

108.     Mr. Guidotti was careless in failing to be attentive to his surroundings in other ways.

109.     Had Mr. Guidotti been attentive to his surroundings he would likely have had the

presence of mind to observe the absence of Decedent in time to take affirmative action to rescue Decedent.

110.	Upon information and belief, Mr. Guidotti was also negligent in operating the Vessel while mentally impaired, and perhaps under the influence of alcohol or drugs.

111.	Through the consumption of alcohol and possibly drugs, Mr. Guidotti carelessly diminished his judgment and ability to operate the Vessel safely in violation Maryland Code, Natural Resources Article (hereafter "Nat Res."), §8-738 (pertaining to operation of a vessel while under the influence).

112.	During his journey across the Bay, Mr. Guidotti was further negligent by failing to maintain a clear, unobstructed view of his surroundings, and in failing to "scan" the water aft and forward.

113.	Mr. Guidotti was negligent in choosing to operate the Vessel in a reckless or dangerous manner in violation of Nat Res. §8-738.2.

114.	Mr. Guidotti was negligent by failing to notice the absence of Decedent, by failing to concern himself with his crewmembers' whereabouts, and by failing to take the requisite action to timely alert authorities to  the disappearance of Decedent or come to Descendant's rescue when he knew or should have known Decedent was missing.

115.	Mr. Guidotti was negligent in failing to throw a floatable device overboard when he knew or should have known of Decedent's disappearance, which would have enabled Decedent to cling to such device.

116.	Mr. Guidotti was negligent by failing to come to his crewmember's assistance when he knew of should have known Decedent had gone overboard.

117.	Federal maritime law as codified in 46 U.S.C. §§2303 and 2304, imposes upon master

or individuals in charge of a Vessel a general duty to render assistance to those injured or lost at sea.

118.     In particular, 43 U.S.C. §2303 states in relevant part:

> *Duties related to marine casualty assistance and information*
> *(a)   The master or individual in charge of a Vessel involved in a marine casualty shall—*
> *(1) **render necessary assistance to each individual affected to save that affected individual from danger caused by the marine casualty**, so far as the master or individual in charge can do so without serious danger to the master's or individual's Vessel or to individuals on board; and*

119.     Title 43 U.S.C. §2304 states in relevant part:

> *§ 2304. Duty to provide assistance at sea*
> *(b)   A master or individual in charge of a Vessel shall render assistance to any individual found at sea **in danger of being lost**, so far as the master or individual in charge can do so without serious danger to the master's or individual's Vessel or individuals on board.*
> *(c)   A master or individual violating this section shall be fined not more than $1,000, imprisoned for not more than 2 years, or both.*

120.     These provisions generally impose upon a boat captain the duty to render assistance to his or her crewmembers.

121.     Mr. Guidotti, as captain and owner, failed to render the assistance to Decedent required by Title 43 U.S.C. §§2303 and 2304.

122.     Mr. Guidotti not only failed to initiate proper rescue measures himself; he failed to properly aid in the efforts of others to rescue Decedent.

123.     In fact, Mr. Guidotti took no effort directly or indirectly to rescue Decedent.

124.     Most basically, Mr. Guidotti failed to stop or turn around his Vessel when he knew or should have known that Decedent had gone missing.

125.     And Mr. Guidotti committed subsequent and separate careless actions by failing to promptly notify authorities of Decedent's disappearance, or to accurately communicate where and when Decedent went missing.

126.    Mr. Guidotti was careless in failing to mark the location or time when Decedent was lost.

127.    Mr. Guidotti was careless by failing to adequately familiarize himself with the waters he was navigating by consulting the navigational chart, also prevented him from marking the location of Decedent's disappearance.

128.    Mr. Guidotti  was negligent because when he finally did get around to alerting the authorities about the disappearance of the Decedent, he did so belatedly and incoherently.

129.    And when he did get around to alerting the authorities, he did so, on information and belief, only after rendering himself under the influence of drugs, when he knew of should have known that this would have prevented him from remembering or communicating with necessary precision the location or time Decedent was lost.

130.    Even when the authorities had begun their search for Decedent, Mr. Guidotti still failed in his obligation to properly apprise them of the precise time Decedent went missing or, upon information and belief, of Decedent's potential position.

131.    Mr. Guidotti's, actions in failing to timely advise the first responders in a coherent manner of what occurred, when it occurred and where it occurred wasted precious time, which sealed the fate of Decedent.

132.    But for Mr. Guidotti's carelessness  in failing to promptly convey meaningful information to the authorities, first responders would have otherwise been able to rescue had Mr. Guidotti.

133.    In most cases, Mr. Guidotti's duty was established by statute, and was designed to protect the specific class of persons of which Decedent was one.

134.    Mr. Guidotti's violation of these maritime statutes proximately caused Decedent's

death.

135.     In summary, Decedent died as a direct result of  Mr. Guidotti's profound and obvious

carelessness.

136.     Mr. Guidotti, among other things, failed to keep or use adequate emergency and safety

equipment, failed to accurately track the weather, failed to take evasive action when the weather

worsened, failed to inspect the boat or alert his crewmember Decedent to any defective holding

bars or cloth that created a dangerous condition, failed to adequately warn Decedent of the

potential hazards to his safety, failed to effect proper repairs and maintenance of the Vessel,

failed to have on board or to deploy necessary floatation devices as required by law, failed to

deploy these safety devices, failed to have on board the Vessel any working communications

equipment or failed to utilize such equipment, failed to be cognizant of the whereabouts or

presence of his passenger that he knew or should have known was missing, failed to report the

incident to authorities when he first knew Decedent was missing, failed to look for him, and

failed to mark the location where Mr. Guidotti was last seen.

137.     Had Mr. Guidotti properly rendered assistance to Decedent -- had he even so much as

contacted authorities to assist in the rescue in a timely and proficient manner -- Decedent would

likely be alive today.

138.     For the negligent actions and omissions of Mr. Guidotti, The Estate of Kevin Charles

Yates, Sr. is entitled to damages under Maryland's Survivor's statute for the pain, suffering and

mental anguish Decedent was forced to endure.

139.     Without question, in the minutes before his death, Decedent suffered significant

anguish, fear and distress.

140.     As evidenced by the voice mail transmissions, Decedent was conscious for some time

after falling overboard – and likely struggled for his breath before perishing.

141.    Decedent's anguish, fear, distress would have intensified as he watched Mr. Guidotti

drive the Vessel out of sight despite his cries for help, and as he confronted his ever-diminishing

hope for Mr. Guidotti to return and render assistance (*e.g.,* by calling authorities in a timely

manner).

142.    Decedent's suffering would have been compounded further when when he realized that

his desperate cell phone calls for help were being sent to voice mail and ignored.

143.    The Estate of Kevin Charles Yates, Sr. is entitled as well to funeral expenses paid (up to

the limit stated in Md. Code, Est.&Trusts 8-106(c)).

        **WHEREFORE,** the Estate of Kevin Charles Yates, Sr. seeks judgment against Mr.

Guidotti in an amount that exceeds SEVENTY-FIVE THOUSAND ($75,000) for the damages

he endured at the hands of Mr. Guidotti.  Such damages include non-economic damages, for the

pain, suffering and mental anguish Decedent sustained between the time he fell overboard from

the Vessel until the time of his death. In addition to these non-economic damages, the Estate of

Kevin Charles Yates, Sr. seeks costs, and pre- and post-judgment interest as appropriate.


**COUNT II: GROSS NEGLIGENCE**
**(Against Mr. Guidotti on Behalf of the Estate of Kevin Charles Yates, Sr. under the**
**Survival Statute (as Authorized by CJP §6-401))**

144.    Plaintiff, Estate of Kevin Charles Yates, Sr., through Laura Marie Burge-Yates, its

Personal Representative, incorporates by reference each and every prior and subsequent

allegation as if fully set forth herein.

145.    Mr. Guidotti's acts, errors and omissions constituted more than simple negligence: they

constitute *gross* negligence which was the proximate cause of Decedent's demise.

146.    Through his actions and omissions Mr. Guidotti, exercised willful and wanton

misconduct.

147.    Through his actions and omissions Mr. Guidotti showed reckless disregard for the life of Decedent.

148.    In fact, Mr. Guidotti's actions and failure of actions was so utterly indifferent to the rights of Decedent, that he effectively acted as if those rights did not exist.

149.    The wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is evidenced by Mr. Guidotti's failure to check the weather, his failure to ensure the Vessel had the requisite safety equipment and signaling devices on board, and his failure to have at his disposal operational communication equipment.

150.    Mr. Guidotti's wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is demonstrated by his failure to properly acquaint himself with the Vessel or its safety equipment.

151.    Mr. Guidotti's wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is demonstrated by his failure to observe the whereabouts of Decedent, his sole crewmember, when he went missing.

152.    Mr. Guidotti's wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is demonstrated by Mr. Guidotti's failure to adhere to the plethora of statutory and regulatory requirements that would have prevented the tragedy from occurring; specifically, Mr. Guidotti's failure to have on board or to deploy U.S. Coast Guard-approved Personal Floatation Devices or Visual Distress Signals.

153.    Mr. Guidotti's wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is demonstrated by the fact that after he knew or should have known Decedent was no longer on board the Vessel, Mr. Guidotti failed to come to Decedent's aid in any manner,

either by looking for Decedent, by throwing a floatable device, by stopping the engines of his Vessel, by marking the location or by signaling or calling for help.

154.     Mr. Guidotti's wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is demonstrated by the fact that he initiated no timely alert to emergency services.

155.     Moreover, Mr. Guidotti's wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is demonstrated by the fact that when  he finally did speak to the authorities well after the event, he failed to identify with responsible precision the location Decedent was last seen or rendered himself incapable of coherently doing so.

**WHEREFORE,** the Estate of Kevin Charles Yates, Sr. seeks judgment against Mr. Guidotti in an amount that exceeds SEVENTY-FIVE THOUSAND ($75,000) for the damages caused by Mr. Guidotti's gross negligence.  Such damages include non-economic damages, for the pain, suffering and mental anguish Decedent sustained between the time he fell overboard from the Vessel until the time of his death. In addition to these non-economic damages, the Estate of Kevin Charles Yates, Sr. seeks costs, and pre- and post-judgment interest as appropriate.

## COUNT III: NEGLIGENCE
**(Against Mr. Guidotti and on Behalf of All Individual Plaintiffs for the Wrongful Death of Decedent (as Authorized by CJP §3-904))**

156.     All individual Plaintiffs incorporate by reference each and every prior and subsequent allegation as if fully set forth herein, particularly those set forth in the Common Factual Allegations and in Count I of this Complaint.

157.     Mr. Guidotti at all times relevant hereto owed Decedent the duty to exercise reasonable care to protect Decedent from injury.

158.     Mr. Guidotti breached this duty of care to Decedent by his acts and omissions before the

journey began, when piloting the Vessel and after he knew of should have known of Decedent's disappearance.

159.    Because of the Wrongful Death of Decedent caused by Mr. Guidotti's negligence, the Decedent's immediate family, who was financially dependent on the Decedent, has suffered foreseeable, continuing, preventable, and substantial pecuniary harm.

160.    Ms. Burge-Yates has suffered the loss of the financial contributions that Decedent would have contributed to the family unit; including, those contributions that would have been made to their mutual consumption, to their retirement, to their mortgage, and to the welfare of their son, including for his education.

161.    Decedent was born March 20, 1977, making him 41 years-of-age at the time of his early death.

162.    Decedent was a father, a devoted husband and a small business owner, and over the course of his lifetime contributed approximately 50 percent of the earnings to the household.

163.    In fact, until his untimely death, Decedent was the owner and operator of Differential Marine, LLC of Church Hill, Maryland, having worked in and around the marine industry for much of his life.

164.    With the assistance of his spouse in providing a stable source of income, Decedent's prospects for operating and growing this business were promising, and his earnings were projected to increase commensurately.

165.    Through Decedent's death, Ms. Burge Yates has also suffered the loss of fringe benefits attributable to Decedent; including medical care and insurance, Social Security coverage, a federal tax exemption, and paid leave and holidays

166.    Ms. Burge-Yates has suffered the loss of household services that would have been performed by the Decedent, such as Decedent's contributions to lawn and maintenance work, household chores and the maintenance of the home, yard, appliances and automobile.

167.    Mr. Charles Kevin Yates, Jr. has lost the value of the nurturing, instruction, physical, intellectual and moral guidance that he would have received from Decedent, but for his father's premature passing.

168.    Mr. Charles Kevin Yates, Jr. has also lost the value of the net assets that he would have eventually inherited from his father; consisting of accumulated savings over the course of Decedent's lifetime less than less the amount Decedent would have consumed for his own well-being.

169.    And apart from these substantial pecuniary losses, the pain and anguish faced by Decedent as he drowned, has been visited upon his entire family, in the form of recoverable non-economic damages.

170.    The non-economic damages suffered by the Plaintiffs through the Wrongful Death of Decedent include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care (marital care, parental care, filial care as the case may be), attention, advice, counsel, training, guidance, or education.

171.    And these non-economic damages were exacerbated by the manner of the loss.

    **WHEREFORE,** all the individual Plaintiffs, Ms. Burge-Yates, Mr. Kevin Charles Yates, Jr., Ms. Starr Yates and Charles Lewis Yates. Jr. seek judgment against Mr. Guidotti in an amount that exceeds SEVENTY-FIVE THOUSAND ($75,000) for Mr Guidotti's negligence in causing the Wrongful Death of Decedent.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

**COUNT IV: GROSS NEGLIGENCE**
**(Against Mr. Guidotti and on Behalf of All Individual Plaintiffs for the Wrongful Death of Decedent (as Authorized by CJP §3-904)**

172.     Each Plaintiff incorporates by reference each and every prior and subsequent allegation as if fully set forth herein, particularly those set forth in the Common Factual Allegations and in Count II of this Complaint.

173.     As more fully set forth therein, Mr. Guidotti's acts, errors and omissions constitute *gross* negligence.

174.     Through his actions and omissions, Mr. Guidotti, exercised willful and wanton misconduct, which demonstrated reckless disregard for the life of Decedent.

175.     The wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is evidenced by Mr. Guidotti's failure to check the weather, failure to ensure the Vessel had the requisite safety equipment and distress signaling devices on board, and failure to have at his disposal operational communication equipment.

176.     Mr. Guidotti's wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is demonstrated by his failure to properly acquaint himself with the Vessel or its safety equipment, his failure to observe the whereabouts of Decedent, his sole crewmember when he went missing, his failure to adhere to the plethora of statutory and regulatory requirements that would have prevented the tragedy from occurring, his failure to come to Decedent's aid in any manner, his failure to initiate a timely alert to first responders, and his failure to identify with reasonable precision the position that Decedent disappeared.

177.     The injury Mr. Guidotti inflicted upon Decedent and his family was done with utter indifference to the rights of Decedent's family and to the consequence of his action.

     **WHEREFORE,** the individual Plaintiffs, Ms. Burge-Yates and  Mr. Kevin Charles

Yates, Jr., Ms. Starr Yates and Charles Lewis Yates. Jr. seek judgment against Mr. Guidotti in an amount that exceeds SEVENTY-FIVE THOUSAND ($75,000) for Mr. Guidotti's Gross Negligence which caused the Wrongful Death of Decedent, as the case may be.  Such damages include of economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

### III.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, in their representational and individual capacity, Pray for judgment against Defendant in an amount that exceeds SEVENTY-FIVE THOUSAND ($75,000).

In particular, as more fully set forth in Counts I and II, and as authorized by Maryland's Survivor statute, the Estate of Kevin Charles Yates, Sr. Prays for non-economic damages caused by the pain, suffering and anguish experienced by Decedent, punitive damages as may be allowed by law, pre-judgment and post-judgment interest as allowed by law, the costs of this suit herein and such other and further relief as this Honorable Court may deem just and proper.

As more fully set forth in Counts III and IV, as authorized by federal maritime common law and Maryland's Wrongful Death statute, Plaintiffs Burge-Yates and Kevin Charles Yates, Jr., Pray for pecuniary damages to which they are entitled.  Specifically, Plaintiffs Burge-Yates and Kevin Charles Yates, Jr. Pray for damages representing the loss of income, savings and the value of services provided by Decedent.  These Plaintiffs also pray for pre- and post-judgment interest as allowed by law upon these damages, the costs of this suit and such other relief as this Honorable Court may deem just and proper.

As more fully set forth in Counts III and IV, as similarly authorized by federal maritime common law and Maryland's Wrongful Death statute, all Plaintiffs in the Wrongful Death

action, Pray for non-economic damages to which they are entitled.  All Plaintiffs also Pray for

punitive damages, pre- and post-judgment interest as allowed by law, the costs of this suit and

such other and further relief as this Honorable Court may deem just and proper.

## IV. DEMAND FOR JURY TRIAL

Recognizing this is a maritime claim, Plaintiffs demand a trial by jury for all claims

hereunder that may be triable before a jury.

Respectfully submitted,


/S/ *Dan R. Mastromarco*


_____

**DAN R. MASTROMARCO**
Fed. MD Bar ID 18243
MD CPF ID: 0901140002
**STEPHEN KLING**
*Attorneys for Plaintiffs Laura Marie Burge-Yates*
*(in her Individual and Personal Representative Capacity*
*(and Successor-in- Interest to Decedent in the Survival Action))*
*and Attorney for Kevin Charles Yates,*
THE MASTROMARCO FIRM, LLP
703 Giddings Avenue, U6
Annapolis, MD 21401
danmastromarco@gmail.com
410.349.1725 O
202.285.9097 C
410.268.1597 F